FILED

2007 Feb-22  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **KAREN JEMISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:05-CV-1699-VEH** |
| | ) | |
| **LEGACY CABINETS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

The court has before it the June 9, 2006 motion (doc. #21) of defendant Legacy Cabinets, Inc. ("Legacy") for summary judgment and the brief (doc. #22) in support thereof. The court also has before it Legacy's July 11, 2006 motion (doc. #28) to strike.

Having considered the briefs and evidentiary submissions, the court finds that defendant's motion (doc. #21) for summary judgment is due to be granted in part and denied in part for the reasons outlined below. Defendant's motion (doc. #28) to strike is also due to be granted in part and denied in part for the reasons outlined below.

## I.   INTRODUCTION

Plaintiff Karen Jemison ("Jemison") initiated this lawsuit (doc. #1) on August 10, 2005 by filing a complaint in this court. The complaint asserts claims for: (1) Title VII sexual harassment (Count I); (2) Title VII gender and race pay

discrimination (Count II); (3) violation of the Equal Pay Act (Count III); (4) 42

U.S.C. § 1981 pay discrimination (Count IV); (5) 42 U.S.C. § 1981 race

discrimination in failure to promote (Count V); (6) Title VII gender discrimination

in failure to promote (Count VI); (7) invasion of privacy (Count VII); (8) negligent

and/or wanton hiring, retention, training, and supervision (Count VIII); (9) Title VII

retaliation (Count IX); and (10) assault and battery (Count X).

Defendant Legacy's June 9, 2006 motion (doc. #21) for summary judgment

asserts that no genuine issue of material fact exists and that Legacy is entitled to

judgment as a matter of law as to all claims asserted against it.  The parties have each

filed briefs and submitted evidence in support of their respective positions concerning

the pending motion for summary judgment.  On June 9, 2006 defendant Legacy

submitted evidence[1] (doc. #23) in support of the motion (doc. #21), and also

submitted a supporting brief (doc. # 22).  Plaintiff submitted evidence[2] (doc. #26) in

---

[1] Defendant Legacy submitted: the declaration of Fred Harris with exhibits; Legacy Cabinets' Employee Handbook; the Acknowledgment of Training form signed by plaintiff; Fred Harris' handwritten notes on plaintiff's pay contained within her personnel file; payroll records from lead employees from September 1, 2003 to September 27, 2004; the deposition transcript of Fred Harris; the deposition transcript of Alejandra Arevalo; the deposition transcript of plaintiff; Legacy Cabinets' interrogatory answers; and the deposition transcript of Shane Cannoy.

[2] Plaintiff submitted (where not previously submitted): the deposition transcript of Clarence Street; Jemison training sheet; a blank training sheet; plaintiff's supplemental interrogatory answers; the declaration of Lanesia Johnson; an

opposition to the motion for summary judgment on June 30, 2006 and on the same date submitted a brief (doc. #25) in opposition to defendant's motion for summary judgment.

On July 11, 2006, defendant filed a reply brief (doc. #27) to plaintiff's opposition, along with a motion (doc. #28) to strike certain evidence relied upon in plaintiff's opposition brief.  On July 25, 2006 plaintiff responded in opposition (doc. #31) to defendant's motion to strike.

Both the motion (doc. #21) for summary judgment and the motion (doc. #28) to strike are considered herein.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could

---

unemployment transcript; Charging Party's statement of the facts; the handwritten notes of Karen Jemison; the unemployment determination; the Board of Appeals determination; plaintiff's resignation letter; the statement of Sylvia Garrett; the deposition transcript of Fred Harris; the deposition transcript of Alejandra Arevalo; the deposition transcript of Karen Jemison; and the deposition transcript of Shane Cannoy.

return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 134 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509-12 (1993); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981), as modified by Desert Palace v. Costa, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).[3]

Under the McDonnell Douglas/Burdine scheme, a plaintiff first has the burden of proving by a preponderance of evidence a prima facie case of discrimination. Once the plaintiff proves a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment

---

[3] Jemison only argues that she has established a circumstantial case of discrimination.  (See Doc. #28 at 24).

4

decision.  Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-54; Desert Palace, 539 U.S. at 101-02.  The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  Chapman v. AI Transport, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   STATEMENT OF FACTS[4]

### A.   Business and Policies of Legacy

The business of Legacy is the manufacture of cabinets.  (See Harris Decl. at ¶ 2.)  The company was formed in 1994 and currently employs over 300 people in

---

[4] These are the facts for summary judgment purposes only.  They may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

Eastaboga, Alabama.  (AF No. 1.)[5]  Legacy has a written policy, contained in the

Employee Handbook, prohibiting sexual harassment and discrimination.[6]  (AF Nos.

2, 3.)  The Employee Handbook also provides a complaint procedure for reporting

---

[5] The designation "AF" stands for admitted fact and indicates a fact offered by Legacy that Jemison has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case.  Whenever Jemison has adequately disputed a fact offered by Legacy, the court has accepted Jemison's version. The court's numbering of admitted facts (e.g., AF No. 1) corresponds to the numbering of Legacy's Statement of Facts as set forth in Doc. #22 and responded to by Jemison in Doc. #25.  Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Jemison's Statement of Facts contained in Doc. #25 and responded to by Legacy in Doc. #29.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

[6] With respect to sexual harassment, Legacy Cabinets prohibits the following:
    1. Unwelcome sexual advances; requests for sexual favors; and all other verbal or physical conduct of a sexual or otherwise offensive nature, especially where

    * Submission to such conduct is made either explicitly or implicitly a term or condition of employment;

    * Submission to or rejection of such conduct is used as the basis for decisions affecting an individual's employment; or

    * Such conduct has the purpose or effect of creating an intimidating, hostile, or offensive working environment.

    2.  Offensive comments, jokes, innuendos, and other sexual oriented statements.

(See Doc. #23, Exh. 2 at 0029-0030.)

sexual harassment.[7]    (AF No. 4.)   Jemison's signature appears on the "Legacy

Cabinets, L.L.C. Acknowledgment of Training" form.[8]   (See Jemison Dep. at 53, 58-

---

[7] Each member of management is responsible for creating an atmosphere free of discrimination and harassment, sexual or otherwise.  Further, employees are responsible for respecting the rights of their coworkers.

    If you experience any job-related harassment based on your sex, race, national origin, disability, or another factor, or believe you have been treated in an unlawful, discriminatory manner, promptly report the incident to your supervisor, who will investigate the matter and take appropriate action, including reporting it to the Personnel Manager.  If you believe it would be inappropriate to discuss the matter with your supervisor, you may bypass your supervisor and report it directly to the Plant Manager, who will undertake an investigation.  Your complaint will be kept confidential to the maximum extent possible.

    If Legacy Cabinets determines that an employee is guilty of harassing another employee, appropriate disciplinary action will be taken against the offending employee, up to and including termination of employment.

(See Doc. #23, Exh. 2 at D0030.)

[8] Plaintiff Jemison indicates her dispute as to Defendant's Initial Statement of the Facts numbers 5 and 7 and offers her deposition testimony in contradiction thereto.  Defendant's fact number 5 states that "Legacy informs employees of this policy during their orientation and provides them with a copy of the written policy in the form of the Employee Handbook and by requiring them to sign an Acknowledgment form like the one Plaintiff signed, as discussed below." (See Doc. #22 at 2-3; see also Doc. #25 at 1.)  Defendant's fact number 7 states that "[s]oon after starting work with Legacy, Plaintiff signed an Acknowledgment of Training form." (See Doc. #22 at 3; see also Doc. #25 at 2.)  Plaintiff's stated objection to the fact that she signed the acknowledgment form [Exhibit 5] and/or does not recall signing the form is without support from the record.

> Q: Okay.  And looking at Exhibit 5 [the acknowledgment of training form], is that also your signature?
> A: Yeah, that's my signature.
> (Jemison Dep. at 53.)
> . . .

---

Q: As best you recall, was that form signed on the day that it's dated [October 4, 1999]?
A: No.

Q: You think it was signed some other day?
A: I don't recall this one.  I just don't recall it.
(Id.)
. . .

Q: Does that look like your handwriting on the date at the top of Exhibit 5?
A: It looks like my signature, but these dates, it's not corresponding with my remembrance because it's those dates.

Q: But what I'm asking you is does that handwriting, "10-4-99," look like your handwriting?
A: No.  That – this don't, that date don't.
(Id. at 53-54.)
. . .


Q: Is that your signature on Exhibit 5?
A: That, that could be my signature, but this date up here, I did not write that date.
(Id. at 54-55.)
. . .

Q: But that is your signature on Exhibit 5?  Is what you're telling me –
A: That's my signature.

Q:  – that you didn't read the document before you signed it; is that right?
A: I don't even recall this document.

Q: I understand that.  Looking at that document today, reading that document today, had you read that document, you would have been aware that Legacy Cabinets has an anti-discrimination policy, wouldn't you?
. . .

A: If I had read this document, I would have signed it.

Q: Okay.  And had you read it, you would have been aware that Legacy Cabinets had a policy against discriminating, wouldn't you?
. . .
A: If I read it, I would have been aware, yes sir.
(Id. at 55-56.)
. . .

Q: And looking at [Exhibit] No. 5, had you read this document, you would be aware that you were responsible for preventing sexual harassment in the workplace and for taking prompt, effective action if you knew or had reason to know of harassment in the workplace?
A: If I had read it.

Q: Is there any reason you didn't read that document before you signed it, Ms. Jemison?
. . .
A: I do not believe I signed that document.

Q: But you think that's your signature on that document, don't you?
A: Yes.

Q: So, you think somehow your signature was forged or altered in some way?
A: Yes.

Q: What evidence do you have of that, Ms. Jemison?
A: Because of the date.

Q: You don't have any evidence that that document was forged or altered in any way, do you?
. . .
A: Yes, I do.

Q: What evidence?
A: The date.

9

59; <u>see</u> <u>also</u> Def.'s Exh. 5 to Jemison Dep.)  The Acknowledgment states:

> I acknowledge that on 10-4, 1999, I attended sensitivity training and I understand that:
>
> 1.  All employees shall be treated with equality regardless of race, gender, age, disability, national origin or religion.
> 2.  Every employee has the right to work in an environment free from sexual harassment.
> 3.  I have a responsibility not to engage in sexually harassing behavior.
> 4.  If I feel I am being harassed, I have the right and responsibility to either communicate directly to the harasser or to a non-involved supervisor.
> 5.  I am responsible for preventing sexual harassment in the workplace and for taking prompt effective action if I know or have reason to know of harassment in the workplace.

(AF No. 8.)

### B.    Jemison's Employment with Legacy

---

Q: That's your pure speculation?
A: The date.
(<u>Id.</u> at 58-60.)

Jemison admitted several times during the course of her deposition that her signature appears on the acknowledgment of training form.  The fact that Jemison speculates later in her deposition that the signature could be a forgery because she did not write in the date on the document does not alter her earlier admission.  Therefore, Defendant's fact numbers 5 and 7, as they relate to Jemison having signed the acknowledgment form, will be taken as true by the court for the purpose of summary judgment.  However, the court will take as true Jemison's testimony that she did not date the acknowledgment of training form.

### 1.  Jemison's Work History, Job Duties and Responsibilities

Jemison began working for Legacy in 1999 as a sander in the sanding department.  (AF No. 6.)  In 2001, Jemison was promoted to the position of "lead person."  (AF No. 9.)  The traditional responsibilities of a lead person are: setting up the lines; making sure everyone reports to work; breaking people in and out for restroom breaks; getting the parts up; making sure employees were getting the cross-grain out of the doors; making sure the right doors were getting to the right place to ship; making sure that employees had pallets, knives, and safety glasses; and making sure the different departments had their parts and the paint room had accessories.  (AF No. 10.[9]) Jemison also, as lead person, supervised the workers on the sanding line.[10]

---

[9] The court recognizes that plaintiff stated her dispute with defendant's fact number 10.  However, the actual dispute, as evidenced by plaintiff's commentary, is not that these are the traditional duties of a lead person.  (See Doc. #25 at 2, No. 10.)  Rather, the actual dispute is whether Jemison performed duties *in addition to* the traditional lead person duties.  (See id.)  Therefore, that plaintiff performed the responsibilities of lead person will be considered for the purpose of summary judgment.

[10] Jemison was asked in her deposition the differences between her job as lead person and the job of her supervisor.  Jemison testified as follows:

Q: What all did [your supervisor's] job entail?
A: About the same thing as mine.

Q: Anything different?
A: Well, he just be in – the only thing different, he would get to be in the meetings, supervisor meetings.

(See Jemison Dep. at 38, 70-71, 185-86.)

In February 2003, Jemison's supervisor, Clarence Street, was called to active military duty.  (AF No. 14.)  At that time, Jemison desired a promotion to Street's position.  (AF No. 15.)  However, Legacy held Street's position open pending his return from military service.  (AF No. 16.)  In the interim, several employees filled in for Street, including Casey Nunn (a supervisor in another department), Audie Hallman (Assistant Plant Manager), and Shane Cannoy (Assistant Supervisor and supervisor in another department).  (See Harris at ¶ 9; see also Jemison Dep. at 71-72.)[11] All three of these individuals held titles and positions senior to Jemison's lead

---

Q: Any other things different?
A: Because he told them at one point in time that I could – whatever I said went.  If they was doing something wrong, whatever I said went, because he was going to take my side because I was his lead person.  So, there wasn't too much different in me and his job.  The only thing different, he got paid more.  Because I would be there at 5:00 when he would come in at 5:05, 10.  I had to be there.  I would work over just like he would.

Q: You had to be there because that's when you were scheduled to work; isn't that right?
A: Lead people only like – I think when I was working there, they had to, like, on Wednesday and Friday, we had to stay over.  And like sometimes the sanding line would have to stay over and maybe get some doors out, must ship doors.  It was told to me once that lead people had to stay over.

(Jemison Dep. at 186-87.)

[11] The court recognizes that plaintiff has indicated her dispute as to defendant's fact number 20.  (See Doc. #22 at 5, No. 20; see also Doc. #25 at 2, Nos. 19, 20.)

12

person title.  (AF No. 21.)  Jemison was not a supervisory level employee, despite the fact that she performed some supervisory-type duties as a lead person and despite the fact that she also filled in for Street at times.[12]  (See Jemison Dep. at 38, 70-71, 185-86.)

### 2.  Legacy's Pay Scale and Jemison's Wages

In the five years between her hiring and resignation, Jemison received eight pay increases on at least an annual basis, thus increasing her pay from $7.00 an hour to $12.05 an hour.  (AF No. 11.)  On September 1, 2003, Legacy increased Jemison's pay to $11.70 an hour, which was the highest wage Legacy paid to lead employees on the day shift at that time.  (AF No. 12.)  On September 6, 2004, Legacy increased Jemison's pay to $12.05 an hour, which was the highest wage Legacy paid to lead employees on the day shift at that time.[13]  (AF No. 13.)

---

However, plaintiff has no dispute that Nunn, Hallman, and Cannoy actually filled in for Street.  (See Doc. #25 at 2, Nos. 19, 20.)  Rather, plaintiff's dispute is merely that she also filled in for Street in his absence.  (Id.)

[12] According to Jemison, she performed the job of "supervisor" without a change in title or pay for several months in Street's absence.  However, there is no evidence that Jemison performed the traditional duties of a Legacy Supervisor, such as: answering to the Plant Manager; overseeing all aspects of their departments; reporting any personnel issues to the Plant Manager; checking employees' time for accuracy; providing input into hiring, firing, raises and promotions; resolving maintenance issues with equipment; and supervising lead employees in their department.  (AF No. 23.)

[13] In their respective briefs, the parties dispute whether Legacy pays all full-time "lead employees" on the day shift the same hourly wage.  (See Doc. #22 at 6,

Plaintiff claims that Shane Cannoy, Scotty Turman, Sue Harris, Ricky Rainey, and Debbie Gunter were paid more than she was. (AF No. 26.) However, these employees were not classified as lead employees at the relevant time and had responsibilities different than lead employees. (AF Nos. 27-33.)

## C.   Jemison's Sexual Harassment Complaint and Legacy's Response

When Cannoy worked as Jemison's supervisor during the period Street was on active military duty, Cannoy and Jemison interacted continuously throughout the day. (AAF No. 7.) As early as February 2003, Jemison alleges that Cannoy engaged in vulgar behavior.[14]   (AF Nos. 34-36.)   However, it was not until Cannoy was

---

No. 25; see also Doc. #25 at 3, No. 25.) However, plaintiff has admitted that she received at least two pay increases while a lead person at Legacy, and that those increases were equivalent to the "highest wage Legacy paid to lead employees on the day shift at that time." (AF Nos. 12, 13.)

[14] Stating the facts in the manner most favorable to plaintiff, Legacy had a complaint about Cannoy prior to Jemison's February 2004 complaint, but that complaint was specific to Cannoy's relationship with Karen Simmons. Johnson testified, "Karen Simmons . . . [Cannoy] and her had kind of a relationship before he became supervisor. Well, she told me that she invited him to her house one night, and he performed oral sex on her, and she wouldn't put out. So, when he became supervisor, he started harassing her. I just told her to go talk to Pay Traylor, go talk to somebody. Me and her went up there, and she was crying or whatever, and she told Pat, and *nothing happened after that*." (Johnson Dep. at 11-12) (emphasis added). Johnson did not complain to Traylor that she and others on the sanding line also felt they were being harassed. (See id.)

In addition, Johnson heard the plant manager yell at Cannoy "for talking about a white employee's 'titties.' Shane had stressed her out so much that she quit and told Mr. Traylor that Shane had talked about her breasts. I heard Mr. Traylor yell at Mr.

supervising Jemison in February 2004 that Jemison complained to Fred Harris (then

head of human resources) that Cannoy was making sexual remarks.[15]

_____

Cannoy about this. After this incident, Mr. Cannoy was moved into the raw door department by Ms. Jemison and me. I believe Sylvia Garrett overheard this." (Johnson Decl. at ¶ 6(g).)

[15] Specifically, the court accepts as true for the purpose of summary judgment that the following sexually harassing conduct occurred as stated by plaintiff (and disputed by defendant) on a regular basis:

> (a) Cannoy stated to Jemison "a woman is good for just being on her knees, letting me hit the back of her throat with my dick. That is what a woman is good for." (Jemison Dep. at 113.)

> (b) Cannoy stated that "all women are good for are sucking penises and cleaning houses." (Johnson Dep. at 10.)

> (c) Cannoy stated to Jemison that "black women don't like to suck dick, but they will when I am done with them." (Jemison Dep. at 231.)

> (d) Cannoy would regularly say to Jemison he was horny, wanted to have intercourse, and asked for intercourse. His remarks included repeating "I want to fuck," "Don't you wanna fuck that," and "I'm horny, I want to fuck." (Jemison Dep. at 113, 119.)

> (e) Cannoy would try to discuss oral sex with female employees. (See Doc. #26, Exh. 13 at ¶ 8.)

> (f) Jemison heard a female co-worker scream at Cannoy, "I don't suck no motherfucking dicks. I don't do that." When Jemison approached her, the female stated, "They're trying to get me over here talking about I suck dicks. I don't suck on motherfucking dicks." (Jemison Dep. at 113-119.)

> (g) Cannoy would slap/spank Jemison on her buttocks. (Jemison Dep. at 112.)

15

(h) Johnson witnessed Cannoy push his groin against Jemison and say "this is mine." (Jemison Dep. at 112.)

(i) Cannoy would rub Jemison's shoulders more than once a week. (Jemison Dep. at 119.)

(j) Cannoy would remark about women's "booties," and upon seeing certain women would remark "this is my booty." (Johnson Decl. at ¶ 6.)

(k) Cannoy would remark about female co-workers wearing G-string underwear and when he saw a female employee bent over he remarked to Jemison, "Do you want to know who got on a G-string?"  Then he pointed to the female employee and said, "That's what I get paid to do, watch." (Jemison Dep. at 115-116.)

(l) Cannoy would make comments to Jemison on a daily basis about women's breasts.  (Jemison Dep. at 119-120.)

(m) Other male employees acted disrespectfully toward Jemison and other female employees.  (Jemison Dep. at 116-118, 218.)

(n) Jemison witnessed Cannoy pick Sylvia Garrett up and place her on a table.  (Jemison Dep. at 130-131.)

(o) Jemison observed Cannoy give Sylvia Garrett "a wedgie." (Jemison Dep. at 131-132.)

(p) Cannoy suggestively remarked to Jemison about her 17 year old daughter, "She can spend my money."  (Jemison Dep. at 114.)

The Motion (doc. #28) to strike, subsection D is **DENIED** as to paragraph 8 of Plaintiff's Statement of the Undisputed Facts.  The statement is not hearsay when the supporting statement of Sylvia Garrett is considered.  The Motion (doc. #28) to Strike, subsection D is **GRANTED** as to paragraphs 6 and 9 of Plaintiff's Statement of the Undisputed Facts because the pages cited fail to provide support for the dispute.

The court is aware that plaintiff has two additional arguments advanced in

(AAF No. 10, AF No. 39; <u>see also</u> Jemison Dep. at 121.)  Jemison also complained

to Harris that Cannoy had also been harassing Laneisa Johnson, Sylvia Garrett, Cathy

Groce, and Karen Simmons.[16]  (<u>See</u> Jemison Dep. at 93, 120-121.) She had been

afraid to complain before February 2004 because she was fearful that she would be

terminated in retaliation for her complaint.  (<u>See</u> Jemison Dep. at 120-121.)  Cannoy

had threatened Jemison "I'll get you fired" and Jemison believed that "if he wanted

them fired, they would get rid of them." (Jemison Dep. at 126.)  Cannoy made these

threats despite the fact that he did not actually fire, demote, or transfer Jemison, or

---

support of her sexual harassment and retaliation claims that are not included in (a) -
(p) above, but that are outlined in paragraph 28 of Plaintiff's Statement of the
Undisputed Facts and paragraph 3 of Plaintiff's Statement of Disputed Facts.
Because the court, <u>infra</u>, finds that summary judgment is due to be denied as to
plaintiff's sexual harassment and retaliation claims without relying on the
unemployment hearing transcript, subsection A of Defendant's Motion (doc. #28) to
Strike, as it relates to these two examples, is **MOOT**.  Moreover, the remainder of
Defendant's Motion (doc. #28) to Strike, subsection A is **MOOT** because the
unemployment compensation hearing transcript is not needed to support plaintiff's
contentions in: paragraphs 17 and 57 of Plaintiff's Responses to Legacy's Statement
of Facts; and paragraphs 12 and 26 of Plaintiff's Statement of Undisputed Facts.

The court is similarly aware that plaintiff includes two examples of potentially
sexually harassing conduct that Jemison did not herself witness in point 1 of Non-
Moving Party's Statement of Relevant Disputed Facts (doc. #25).  Because the court
finds, <u>infra</u>, that summary judgment is due to be denied as to plaintiff's sexual
harassment claims without relying on this evidence, those examples have been
omitted above.

[16] The court recognizes that defendant disputed plaintiff's fact number 11.
However, Jemison clearly testified in her deposition that "I told [Harris] that
[Johnson, Garrett, Groce, and Simmons] had something to tell [Harris], he [Cannoy]
had been harassing them, too."  (Jemison Dep. at 93.)

decrease her pay in any way.[17]  (See Jemison Dep. at 126-27.)

Immediately after receiving the complaint, Harris began his investigation into the matter.  (AF No. 41.)  The same day, Harris suspended Cannoy pending the outcome of his investigation.  (AF No. 42.)

Harris's investigation revealed evidence of sexual harassment[18] and Cannoy was fired for violating company policy.  (AF No. 45; see also Jemison Dep. at 97.)

### D.  Cannoy's Return to Work at Legacy

On May 17, 2004, Legacy rehired Cannoy after he called asking to be considered for a job.  (AF No. 49.)  Legacy rehired Cannoy because the company was growing "by leaps and bounds" and needed someone who could handle the door department.  (AF No. 50.)  Cannoy was well qualified, well trained, and needed in the door department.  (AF No. 50.)  However, before Legacy rehired Cannoy, Harris and Rodney Suggs (President of Legacy) had a long talk with him about what he could and could not do and told him that if there were any problems at all, his employment with Legacy would be terminated.  (AF No. 51.)  Harris and Suggs also ordered

---

[17] The court recognizes that defendant disputed plaintiff's fact number 12, with the contention that Cannoy had no such actual authority.  However, whether or not Cannoy had the authority to fire, demote, etc. has no bearing on whether Cannoy *threatened* to do so.

[18]  Because there is a dispute as to the veracity of this fact, plaintiff's version is taken as true for summary judgment purposes.

Cannoy not to go near Jemison because they did not want Jemison to feel uncomfortable.  (AF Nos. 52, 53.)  In fact, Legacy rehired Cannoy as a lead person on the night shift,[19] which was different from Jemison's shift.  (AF No. 54.)

Despite these precautions, Jemison appeared visibly upset to Street about Cannoy's return to work at Legacy.  (AAF No. 20.)  She complained to Street not only that she felt uncomfortable and intimidated by Cannoy, but also that there was graffiti in the bathroom calling her a "fat bitch."  (See Jemison Dep. at 77, 138-39, 145.)  However, she did not complain that she felt she was being subjected to sexual harassment.[20]  (AF No. 57.)  Jemison did not complain to anyone other than Street about Cannoy's return although she did understand that "if we have any complaints, you go to your supervisor, and then you go up the ladder."  (Jemison Dep. at 157-158.)  However, she did not take the complaint beyond Street because "Pat Traylor [Plant Manager] stressed that point, we are tired of y'all – you stopping us on the floor, complaining, complaining."  (Jemison Dep. at 158.)

After being rehired, Cannoy did not talk to or touch Jemison, despite the fact that he was angry with Jemison for his termination.  (AF No. 55, AAF No. 24.)

---

[19] This position was less senior to and with less pay than the position Cannoy held before Legacy fired him.  (AF No. 54.)

[20] The dispute that plaintiff has with defendant's fact number 57 is cleared up in the above statement of fact.

However, Jemison felt offended when Cannoy stood by the time clock every morning as she clocked in.  (See Jemison Dep. at 138.)  She overheard Cannoy mumble under his breath, "There go one of them now, there they go."  (Id. at 137.)

### E.  Jemison's Resignation and the Genesis of the Lawsuit

Plaintiff filed a charge of discrimination (No. 130-2004-03262) with the Equal Employment Opportunity Commission ("EEOC") on June 16, 2004, claiming she was discriminated against on the basis of her race and gender.  (AF No. 58; see also Doc. #38, Exh. 1.)  On September 27, 2004, Jemison resigned from Legacy.  (AF No. 59.)  Her resignation letter states that she was resigning her employment because she felt that Cannoy's return to work created a threatening environment and that the company tolerated sexual harassment and did not care about protecting its female employees.  (AAF No. 27.)  The same letter states that she was treated "ugly" after complaining about sexual harassment.  (AAF No. 27.)

After her resignation, Jemison filed her second EEOC charge (No. 130-2005-00864), contending that she was discriminated and retaliated against because of her gender and race.  (AF No. 61.)  On July 22, 2005, the EEOC issued its notice of right to sue on both charges.  (AF No. 62.)

## IV.   ANALYSIS

### A.    Title VII Sexual Harassment Claim (Count I)

### 1.    The Basics of Title VII Sexual Harassment

Plaintiff asserts a claim for sexual harassment in violation of Title VII, as that environment was allegedly created by the actions of Shane Cannoy.   Title VII provides that an employer "shall not discriminate against any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin . . ."  42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis added).   Title VII has been interpreted to specifically allow claims for sexual harassment to rest upon the theory of an abusive work environment.[21]  See, e.g., Burlington Indust. v. Ellerth, 524 U.S. 742, 765 (1998).  A plaintiff attempting to show that she has been subjected to an abusive work environment by a supervisor must prove a number of elements to establish the claim.  These elements include proof that: (1) the employee belongs to a protected group; (2) the employee has been subject to unwelcome harassment; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work

---

[21] The Ellerth and Faragher decisions indicate that courts should no longer use the hostile work environment label in analyzing whether an employer should be held liable on a Title VII claim in which no tangible adverse employment decision has been made.  In analyzing claims that heretofore would have been labeled "hostile work environment" claims, courts should ask only whether the conduct complained of "is sufficient to constructively alter an employee's working conditions." Frederick v. Sprint/United Management Co., 246 F.3d 1305, 1311 (11th Cir. 2001).

environment; and (5) a basis for holding the employer liable.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).  "Regarding this fifth factor, the Supreme Court held recently that in claims based on a supervisor's harassment, an employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate (or successively higher) authority over the employee – subject to an affirmative defense." Mendoza, 195 F.3d at 1245 n.4, citing Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Indust., Inc. v. Ellerth, 524 U.S. 742 (1998).

A prima facie showing of a hostile work environment arises only where the sexual harassment is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment." Faragher, 524 U.S. at 786, citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986).  The courts' interpretations of the general standard announced in Meritor "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher, 524 U.S. at 788, citing Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998).  For example, offhand comments, isolated incidents (unless extremely serious), and other similar tribulations of the workplace will not amount to changes altering the terms and conditions of employment.  See id.  Furthermore, in order to be actionable under the statute, the work environment must be offensive on both an

objective and a subjective level.  That is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 787.  This is a question to be determined with regard to the totality of the circumstances. Henson, 682 F.2d at 904.  Additional factors for courts to consider in the totality analysis include: the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993).

An employer is subject to vicarious liability for the actionable hostile environment created by the victim's supervisor, where that supervisor has the authority to affect the terms and conditions of the plaintiff's employment. Faragher, 524 U.S. at 807.  Where no adverse employment decision has been made or has resulted, the Faragher court allows the employer an affirmative defense.[22] Id.; Pennsylvania State Police v. Suders, 542 U.S. 129, 148 (2004).  The affirmative defense requires the defendant to prove "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Faragher, 524 U.S.

_____

[22] Plaintiff does not assert a claim for sexual harassment involving a tangible job action.  (See Doc. #25 at 14, n.2.)

at 807.  The defendant must also prove that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise, *or* the defendant must show that it responded by taking reasonable corrective action after the plaintiff took advantage of the preventive or corrective opportunities provided by defendant.  Id.

### 2.    The Statute of Limitations

Jemison has many complaints about the conduct of Cannoy *prior to* December 20, 2003.[23]  Those complaints, as set forth supra in footnote 15, involve conduct which Legacy believed in totality to be severe or pervasive enough to warrant the termination of Cannoy's employment.  Plaintiff attempts to use such incidents which occurred prior to December 20, 2003 to support her "continuing violation" claim for sexual harassment.  Such reliance is misplaced.

In Watson v. Blue Circle, 324 F.3d 1252, 1258 (11th Cir. 2003) the Eleventh Circuit made clear that: "if, after the employee complains of the alleged discrimination and the employer promptly conducts an investigation and takes any action necessary to see that the discriminatory conduct ceases, a court may find that

---

[23] The EEOC charge was filed on June 17, 2004, alleging discrimination on the basis of race and gender.  Thus, Title VII bars all discrete acts of discrimination which occurred 180 days prior to June 17, 2004, that date being December 20, 2003. See discussion infra, Section IV.D.

the 'intervening action' by the employer cut off the time period of the alleged 'hostile work environment.'" Mitchell v. Overbey, 2005 WL 1983839, No. 5:03-cv-157, at *6, citing Watson, 324 F.3d at 1258-1259.  And so it did here.

There is no dispute that as a result of plaintiff's February 2004 complaint, Cannoy was severely disciplined.  (AF Nos. 42, 45.)  There is no dispute that plaintiff does not complain about anything Legacy did in its investigation of her 2004 sexual harassment complaint.  (AF No. 46.)  Indeed, plaintiff has not made any sexual harassment complaints since February 2004.  (AF No. 48.)  Thus, the effective intervening action by Legacy served to cut off the time period for the alleged hostile work environment.  See Watson, 324 F.3d at 1258.[24]  Any potentially severe or pervasive hostile work environment must have occurred *after* December 20, 2003, then, to be considered by this court in the pending action.  The result is two time periods relevant to plaintiff's sexual harassment complaint: December 20, 2003

_____

[24]The facts in Watson are similar to those alleged herein.  Around December 1996, Watson informed her supervisor that a co-employee had displayed lewd photographs in her presence in the workplace and that she discovered the same co-employee showing pornographic films to co-workers at another facility.  324 F.3d at 1259.  In response to this and other complaints, Blue Circle met with the alleged harasser and ordered him to dispose of pornographic material.  Thereafter, the alleged behavior stopped.  See id.  "We conclude that this 'intervening action' by Blue Circle renders [the above described conduct] no longer part of Watson's hostile work environment claim.  Therefore [the above described conduct] cannot be considered as a basis for Watson's claim in this case."  Id.

through February 17, 2004[25] and May 30, 2004 through September 27, 2004.[26]

### 3.  The Merits of the Sexual Harassment Complaint

Plaintiff alleges that from December 20, 2003 until February 17, 2004 Cannoy regularly engaged in severe or pervasive sexually harassing conduct.  Among her complaints are that Cannoy would regularly talk about sex, specific sexual acts, and specific female body parts, relating all of the talk to Jemison herself, other female employees, and Jemison's daughter.  For the period of May 30, 2004 through September 27, 2004, plaintiff alleges that Cannoy glared at her on a regular basis, singled her out in a remark to a co-worker, and, she assumes, placed offensive graffiti about her in the plant.  (See Doc. #25 at 19.)

The severity or pervasiveness of the alleged conduct does not even come close to the level protected by Title VII when only the time period of May 30, 2004 through September 27, 2004 is considered.[27]   However, plaintiff's sexual harassment

---

[25] Title VII bars all discrete acts of discrimination which occurred prior to December 20, 2003 (the date which was 180 days prior to plaintiff's EEOC charge) and Cannoy's employment was terminated as of February 17, 2004.  Thus, these two months are relevant to plaintiff's sexual harassment complaint.

[26] Cannoy was rehired on May 30, 2004 and Jemison resigned her employment on September 27, 2004.  Thus, these four months are also relevant to plaintiff's sexual harassment complaint.

[27] Perhaps more importantly, the conduct as alleged for the May through September time period would not meet the essential element of the prima facie case that the "harassment" was because of Jemison's gender.

complaint also spans the two winter months in 2003 to 2004 during which Cannoy acted as Jemison's supervisor.  During this time period, plaintiff testifies that she was subjected to constant offensive conduct coupled with sexual statements, innuendos, and propositions.  See Gupta, 212 F.3d at 585.  However, even this crude and unprofessional conduct is not actionable unless it had "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment."  See Meritor, 477 U.S. at 65; see also Miller, 277 F.3d at 1277.

During the period of December 2003 through February 2004, Jemison continued to go to work every day, despite the fact that it was less enjoyable.  See Lawrence v. Wal-Mart Stores, Inc., 236 F. Supp.2d 1314, 1326 n. 21 (M.D. Fla. 2002) ("Plaintiff testified that he felt as if he was walking on eggshells and suffered pain in his stomach . . . These sick feelings could potentially alter one's working conditions.  However, Plaintiff has not presented any evidence that the pain or sick feelings altered his work performance in any overt way or prevented him from attending work").  Jemison was not fired or demoted and was not forced to do anything inappropriate to keep her job.  (See id. at 126-27.)  Her pay was not cut in any way.  (See id.)  Although the court recognizes that a plaintiff need not show tangible effects such as economic harm, see Miller, 277 F.3d at 1277, the plaintiff

must nonetheless show some material alteration of the job performance from a reasonable person's standpoint.  See Gupta, 212 F.3d at 586.  To this end, plaintiff alleges that "after Mr. Cannoy was returned to work, she felt threatened and intimidated by his presence leading her not to work overtime."  (Doc. #25 at 20.) Although plaintiff's *perception* that she *might have* been harassed had she decided to work overtime would not be sufficient grounds upon which to assert that terms and conditions of employment were affected, the evidence in the record does show that plaintiff tended to work more overtime during the period Cannoy was not employed by Legacy.  (See Doc. #27 at ¶ 18.)  Thus, a jury could possibly conclude that the conduct of Cannoy unreasonably interfered with Jemison's job performance by promoting a work environment where she was "fair game" for uninvited touching, offensive propositions, and lewd comments. See Faragher, 864 F. Supp. 1552, 1562 (S.D. Fla. 1994), aff'd., 524 U.S. 775 (1998); see also Jackson v. Cintas Corp., 391 F. Supp.2d 1075, 1089 (M.D. Ala. 2005).  Therefore, defendant's motion for summary judgment as it relates to plaintiff's Title VII claim for sexual harassment is due to be denied.[28]

---

[28] The court will seriously consider any Rule 50 motion brought to its attention during trial as to the Title VII sexual harassment claim.  Although there are some questions of fact the company must overcome, Legacy will likely establish that it has exercised reasonable care to prevent and correct promptly any sexually harassing behavior.  See Faragher, 524 U.S. at 807.  According to the EEOC, "remedial

**B.     Title VII Race and Sex Discrimination Claim for Unequal Pay (Count II); Equal Pay Act Claim (Count III); and 42 U.S.C. § 1981 Claim for Unequal Pay (Count IV)**

Gender-based discrimination in rates of pay to employees is prohibited by the Equal Pay Act of 1963 (EPA), which is a portion of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 206(d) (1976), as well as by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Race based discrimination in rates of pay to employees is prohibited by 42 U.S.C. § 1981.

The EPA was directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex. Title VII, on the other hand, forbids discrimination on the basis of, inter alia, gender and race. 42 U.S.C. § 1981 forbids discrimination only on the basis of race. Thus, plaintiffs have three tools for relief, two of which provide different burdens of proof and all of which may produce different amounts of compensation. See Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1527 (11th Cir. 1992).

**1.     Equal Pay Act (Count III)**

---

measures should be designed to stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur." Id., citing EEOC Notice No. 915.002, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, at § V.C.1.f (June 18, 1999), available at http://www.eeoc.gov/docs/harassment.html. Legacy's remedial measures did just that.

To establish a prima facie case under the EPA, a plaintiff "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 195 (1974), <u>quoting</u> 29 U.S.C. § 206(d)(1)).  Once a plaintiff makes out a prima facie case, the burden shifts to the employer to prove that the difference in pay is justified by one of four exceptions: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex.  <u>See</u> 29 U.S.C. § 206(d)(1).  The jobs held by the employees of opposite sexes need not be identical; rather, they need only be substantially equal.  <u>See</u> <u>Corning Glass Works</u>, 417 U.S. at 203-04.  If the employer fails to meet its burden, the plaintiff wins; plaintiff is not required to prove discriminatory intent on the part of the defendant. <u>See</u> <u>Mitchell v. Jefferson County Bd. of Ed.</u>, 936 F.2d 539 (11th Cir. 1991).

Plaintiff holds on for dear life to her wage discrimination claims with the following testimony:

> Q:    Why do you think other lead employees were paid more than you?
> A:    Well, number one, Shane Cannoy told me he was.
>
> . . .

30

Q:    You don't have any other specific reason you can remember other than what you just told me . . . to support your claim that other lead people were paid more than you?

A:    I cannot claim that I saw their raises or nothing.  I can't say that.

. . .

Q:    No other evidence to support your claim that you were paid differently . . .?

A:    No evidence?

Q:    Right.

A:    None other than Shane Cannoy telling me what he was making before he became supervisor.  So, before he became a supervisor, he was a lead person.

Q:    Did Shane say anything to indicate that that had anything to do with your race?

A:    He just said before I got made supervisor I was paid 13.75, so I took it from there.

Q:    No other evidence to support your claim that you were paid differently because of your gender?

A:    No other than his.

(Jemison Dep. at 199-210.)  Plaintiff then attempts to support this testimony with a handwritten note stating, "On November 14, Shane C[annoy] was talking to me [about] how much he made before he became a supervisor.  Shane said ~~before~~ when he was a lead person he . . . made 13.75 hourly."  (Doc. #26, Exh. 9 at 0091.)

Not only is Jemison's testimony regarding what Cannoy told her inadmissible

as hearsay,[29] but it also fails to support her contention that Legacy paid male lead

employees more than female lead employees.  Stating the facts most favorable to

---

[29] Inadmissible hearsay generally cannot be considered on summary judgment. See Club Car, Inc. v. Club Car (Quebec) Import, Inc., 362 F.3d 775 (11th Cir. 2003) and Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999).  For a district court to consider a "hearsay" statement in a motion for summary judgment, the statement must fall within an exception to the hearsay rule, not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or be used solely for impeachment purposes (and not as substantive evidence).  See Macuba, 193 F.3d at 1323.

Here, plaintiff attempts to use the statement attributed to Cannoy for the truth of the matter asserted.  She argues, however, that the statement is admissible under Federal Rule of Evidence 801(d)(2)(D).  (See Doc. #31 at ¶ 4.)  That rule states that a statement is not hearsay if the "statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FED. R. EVID. 801(d)(2)(D).  It is true that courts have admitted statements of supervisors under Rule 801(d)(2)(D) where there is some evidence that the statement reflected the speaker's participation in employment decisions or the policy of the employer.  See Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005); see also Zaben v. Air Prods. & Chemicals, 129 F.3d 1453, 1456 (11th Cir. 1997).  There is absolutely no evidence of this in the instant case.

Thus, for the purpose of summary judgment, the court accepts as true that Cannoy told Jemison that he earned $13.75 per hour before he became a supervisor, but cannot use the comment to support the truth of the matter asserted.  The same analysis applies to the handwritten note that is part of plaintiff's evidentiary submission.

Therefore, Defendant's Motion (doc. #28) to Strike as set forth in subsection C is **GRANTED**.  The Motion (doc. #28) to Strike as set forth in subsection B is **GRANTED** as to page 0091 of document 26 exhibit 9 and as stated in paragraph 25 of document 25, Plaintiff's Responses to Legacy's Statement of Facts.  Because the handwritten notes are not needed to support Plaintiff's Statement of Relevant Disputed Facts in document 25 sections 1.a, 1.c, 1.g, 1.j, 1.k, and 1.m, the remainder of Defendant's Motion (doc. #28) to Strike as set forth in Subsection B is **MOOT**.

plaintiff, Cannoy only told Jemison that before he was a supervisor, he earned $13.75 per hour.   He did not say <u>where</u> he earned $13.75 or <u>when</u> he earned $13.75. Plaintiff, by her own testimony, "took it from there."

Because plaintiff has failed to establish a prima facie case under the Equal Pay Act, defendant's motion for summary judgment as to that claim is due to be granted.

### 2.   Title VII (Count II) and 42 U.S.C. §1981 (Count IV)

The elements of a claim of race discrimination for unequal pay under 42 U.S.C. § 1981 are the same as under Title VII.  <u>See</u> <u>Rice-Lamar v. City of Ft. Lauderdale</u>, 232 F.3d 836, 843, n.11 (11th Cir. 2000).  A plaintiff may establish a prima facie case of gender or race discrimination under Title VII by demonstrating that she is female and/or black and that the job she occupied was similar to higher paying jobs occupied by whites and/or males.   <u>Miranda</u>, 975 F.2d at 1527.   Once the plaintiff has established the prima facie case, the burden shifts to the employer to establish a legitimate, non-discriminatory reason for the disparity.  <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 255-56 (1981).   The burden of production in rebutting the prima facie case is exceedingly light.  <u>See</u> <u>Perryman v. Johnson Prods., Inc.</u>, 698 F.2d 1138, 1142 (11th Cir. 1983).  Once the defendant has met the burden of articulation, plaintiff must demonstrate that the discriminatory reason more likely than not motivated the employer to pay plaintiff less, or that the employer's

explanation is not worthy of belief.  See Burdine, 450 U.S. at 256.

Plaintiff fails to establish a prima facie case of wage discrimination under Title VII and 42 U.S.C. §1981 for the same reasons as discussed in Section IV.B.1, above. Therefore, defendant's motion for summary judgment as it relates to plaintiff's Title VII and 42 U.S.C. §1981 claims for wage discrimination is due to be granted.

**C.    42 U.S.C. § 1981 Claim for Race Discrimination in Failure to Promote (Count V)**

In Count V of the complaint, plaintiff asserts a claim for race discrimination in failure to promote as prohibited by 42 U.S.C. § 1981.  The Eleventh Circuit applies the same analytical framework to Title VII and § 1981 discrimination claims.  See Hudson v. Mr. Burch Formal Wear, Inc., 2006 WL 2351837, No. 05-16269, at *1 (11th Cir. Aug. 15, 2006), citing Cooper v. Southern Co., 390 F.3d 695, 724-25 (11th Cir. 2004)).   To establish discrimination in a failure to promote case using circumstantial evidence, the plaintiff must show: (1) that she belongs to a protected class; (2) that she applied for and was qualified for the position for which the employer was seeking applicants; (3) that she was denied the promotion; and (4) that another equally or less qualified individual outside of the protected class received the promotion or that the position remained open.  See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005); see also Wilson v. B/E Aerospace, Inc., 376

34

F.3d 1079, 1089 (11ᵗʰ Cir. 2004). After the plaintiff has produced evidence sufficient to establish her prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the failure to promote. See Vessels, 408 F.3d at 767; see also Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642-43 (11ᵗʰ Cir. 1998). Upon articulation, the burden shifts again back to the plaintiff to prove that the articulated reason acted as a pretext for discrimination. See id. at 643; see also McDonnell Douglas v. Green, 411 U.S. 792, 802-03 (1973).

For the purpose of summary judgment, the court will assume that plaintiff has established her prima facie case of race discrimination under § 1981. Legacy has articulated that it selected other, more senior-level employees to temporarily fill the supervisor vacancy left when Clarence Street was called to active military duty. See Denney v. City of Albany, 247 F.3d 1172, 1187 (11ᵗʰ Cir. 2001) (stating that selecting more senior level employees to temporarily fill vacancies qualifies as a legitimate, non-discriminatory reason for failure to promote). Therefore, the burden shifts back to plaintiff to establish that the articulated reason acted as a pretext for racial discrimination.

Jemison's theory of pretext is that: "(1) she regularly helped Mr. Street with his duties and performed them when he was not there; (2) she was considered supervisory level [because she performed some supervisory-like duties and was a lead person];

35

(3) she had greater knowledge of the sanding department than did Mr. Cannoy; (4) Mr. Cannoy did not work in sanding when Mr. Street was a supervisor; and (5) that the Lead Person in Sanding is next in line for the Supervisor position.  The evidence shows that Ms. Jemison was the logical and proper person to assume Mr. Street's supervisory position."  (Doc. #25 at 26-27.)

Instead of rebutting Legacy's articulated reason for selecting other individuals to fill in for Street during his military absence, Jemison's assertions of pretext do nothing more than assert her own belief that her qualifications for the "fill-in" position were superior.  See Ash v. Tyson Foods, Inc., 190 Fed. Appx. 924, 927 (11th Cir. 2006), citing Brooks v. County Commission of Jefferson County, Ala., 446 F.3d 1160 (11th Cir. 2006); Watkins v. City of Huntsville, 176 Fed. Appx. 955 (11th Cir. 2006); Roper v. City of Foley Police Dept., 177 Fed. Appx. 40 (11th Cir. 2006); and Price v. M&H Valve Co., 177 Fed. Appx. 1 (11th Cir. 2006).  That is, Jemison has not met her burden to show that the disparities between her qualifications and those of the Supervisor, the Assistant Plant Manager, and the Assistant Supervisor who actually did "fill-in" for Street were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  Cooper, 390 F.3d at 732.

Therefore, defendant's motion for summary judgment as it relates to plaintiff's claim for racially discriminatory failure to promote in violation of 42 U.S.C. § 1981 is due to be granted.

### D.    Title VII Gender Discrimination in Failure to Promote (Count VI)

Count VI alleges that although plaintiff was qualified to fill the supervisor's position vacated by Clarence Street in February 2003, plaintiff was denied that position because of gender discrimination as prohibited by Title VII of the Civil Rights Act.   (See Compl. Count VI.)   Although it is arguable that plaintiff has abandoned her claim in Count VI, the court will nevertheless address that claim herein.   (See Doc. #25 at 26-27; see also Doc. #22 at 12-13.)

Title 42 U.S.C. § 2000e-5(e)(1) is a charge filing provision that "specifies with precision" the prerequisites that a plaintiff must satisfy before filing suit.   See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002), quoting Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974).   "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."   42 U.S.C. § 2000e-5(e)(1).   A discrete retaliatory or discriminatory act "occurred" on the day that it "happened."   Morgan, 536 U.S. at 110.   Moreover, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.   Each incident of discrimination and

each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Id. at 114.

Plaintiff filed her first charge of discrimination (No. 130-2004-03262) with the EEOC on June 17, 2004, alleging discrimination on the basis of her race and gender. (See Compl. ¶ 7.)  Thus, Title VII bars all discrete acts of discrimination which occurred 180 days prior to June 17, 2004, that date being December 20, 2003.  There is no dispute that the failure to promote about which plaintiff complains occurred in February 2003.  (See Compl. Count VI.) Therefore, defendant's motion for summary judgment as it relates to plaintiff's Title VII claim for failure to promote is due to be granted.

**E.     Title VII Retaliation (Count IX)**

Retaliation is a separate claim under Title VII, and to recover under such a claim, a plaintiff "'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith that the discrimination existed." Gupta v. Florida Bd. of Regents, 212 F.3d 571, 586 (11th Cir. 2000), citing Meeks v. Computer Assocs. Int'l., 15 F.3d 1013, 1021 (11th Cir. 1994).  Thus, even where a plaintiff has failed to make a prima facie showing of discrimination (or present sufficient evidence of discriminatory treatment), she may still have a valid claim for retaliation.

In order to establish a prima facie case of retaliation, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision.  See Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1336 (11th Cir. 1999).  To establish a causal connection, a plaintiff must show that the decision-maker was aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated.  See id. at 1377.  The causal link element is generally construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).  Thus, a "close temporal proximity" between the plaintiff's protected conduct and an adverse employment action generally is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case.  See id.  On the other hand, the Eleventh Circuit has indicated that a substantial delay between the protected activity and the adverse employment action and the absence of other evidence tending to show causation may justify judgment as a matter of law for the employer.  See Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001); see also Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999).  Moreover, the Supreme Court has warned that "mere temporal proximity

39

between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close.'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (citations omitted).

Once the plaintiff has made a prima facie case of retaliation, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment decision. See St. Mary's Honor Cntr v. Hicks, 509 U.S. 502, 507 (1993). Because a plaintiff bears the burden of proving pretext, once defendant has articulated a legitimate, non-discriminatory reason for the termination, plaintiff must present significantly probative evidence proving pretext to avoid summary judgment. See Celotex, 477 U.S. at 317. The plaintiff must establish evidence from which a reasonable trier of fact would disbelieve rather than disagree with defendant's articulated legitimate, non-discriminatory reason for the adverse employment action. See Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997).

In February 2004, plaintiff complained about sexual harassment to Harris, thus engaging in an activity protected by Title VII. (AF Nos. 10, 34-36, 39; AAF No. 10; see also footnote 15, supra and Jemison Dep. at 121.) Plaintiff alleges that after she lodged her complaint, she "received a written warning for her failure to stop the sexual harassment for which she was complaining" (doc. #25 at 24) and was not

40

"called on her radio which is a key part of a Lead Person's job."[30]  (Id. at 24-25.)

In light of Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405, 2409 (2006), the court finds that the alleged acts of retaliation could have been materially adverse to a reasonable employee.[31]   However, plaintiff must still

---

[30] Plaintiff also argues that the act of re-hiring Cannoy was retaliatory (see Jemison Dep. at 244) as was the fact that she did not work overtime in order to avoid having to work with her harasser (see Doc. #25 at 24). These two "acts" by Legacy do not logically belong in Jemison's retaliation claim (but more appropriately exist as part of Jemison's abusive work environment claim).  Legacy terminated Cannoy's employment after Jemison complained about his behavior, despite the fact that the company was under no obligation to do so. It can not then be retaliatory for Legacy to re-hire Cannoy three months later.  Moreover, Jemison's reluctance to work overtime after Cannoy's rehire is not logically attributable to retaliation. Legacy made no "adverse employment decision" to disallow Jemison to work overtime.  Therefore, these two complaints are considered within the context of the abusive work environment claim and not within the context of the retaliation claim.

Plaintiff also argues that the failure to promote her to the "fill-in" position was retaliatory. (See Jemison Dep. at 243-44.) The court is providing plaintiff with every benefit of the doubt by stating that plaintiff contends Legacy retaliated against her by failing to promote her to the position left by Clarence Street.  This basis for retaliation is stated only in plaintiff's deposition, and not in her Brief in Response to Defendant's Motion for Summary Judgment. (See Doc. #25 at 24-25.) Nevertheless, this claim fails for the reasons outlined in Section IV.E., supra.  Plaintiff has wholly failed to establish that Legacy's legitimate, non-discriminatory reason for not selecting Jemison for the "fill-in" position was pretextual.  That is, instead of rebutting Legacy's articulated reason for selecting other individuals to fill in for Street during his military absence, Jemison's assertions of pretext do nothing more than assert her own belief that her qualifications for the "fill-in" position were superior.  On a more basic level, the "fill-in" position was filled before Jemison complained about sexual harassment, and so could not logically be retaliatory.

[31] Plaintiff has not established that she has overcome the adversity threshold as a matter of law and must establish such before a jury.

41

demonstrate a sufficient nexus between her protected activity and the adverse actions she allegedly suffered.

To prove the causal connection, Jemison must show that the complained of actions were motivated by an <u>intent</u> to retaliate against her for engaging in a protected activity and that her protected activity and the adverse action were not "wholly unrelated." <u>Morgan v. City of Jasper</u>, 959 F.2d 1542, 1547 (11th Cir. 1992). As to the claim of not being called on her radio, Jemison asserts that people "all over the plant" had stopped calling her on the radio and telling her "what part they needed, did they need a filler, a fitting or sheet rock." (Jemison Dep. at 140-41.) Not only has plaintiff failed to demonstrate that people "all over the plant" intended to retaliate against her for complaining about Cannoy, but she has also wholly failed to demonstrate that those individuals who stopped calling her on the radio were actually aware that she had complained about Cannoy's behavior.

> In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. <u>See</u> <u>Goldsmith v. City of Atmore</u>, 996 F.2d 1155, 1163 (11th Cir. 1993); <u>Raney v. Vinson Guard Serv., Inc.</u>, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression . . .") That requirement rests upon common sense.  A decision maker cannot have been motivated to retaliate by something unknown to him.

<u>Brungart v. BellSouth Telecommunications, Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000).

Jemison's retaliation claim as it relates to the written warning she received is a different story. Jemison complained to Fred Harris that Cannoy had been saying inappropriate things to her. (AAF No. 10; AF No. 39; see also Harris Dep. at 49.) "She actually said he touched her on the rear end, that type of stuff." (Harris Dep. at 49.) Almost immediately thereafter, Harris and Rodney Suggs gave Jemison "a written warning because she was also in a supervisory position. She had every opportunity to stop that [the harassing behavior she had complained about] herself. She had the authority to do it. She never did anything until that day." (Id. at 51, 68-71.) Although Legacy has "articulated" a legitimate, non-discriminatory reason for the write-up, there is enough evidence from which a reasonable trier of fact would disbelieve rather than disagree with defendant's articulated legitimate, non-discriminatory reason for the adverse employment action. See Combs, 106 F.3d at 1543. Therefore, defendant's motion for summary judgment as it relates to plaintiff's retaliation claim is due to be denied.

### F. Legacy's Liability on the State Law Claims[32] for Invasion of Privacy (Count VII), Negligent and/or Wanton Hiring, Retention, Training, and Supervision (Count VIII) and Assault and Battery (Count X)

Legacy is liable for the intentional torts of Cannoy if: (1) the employee's acts

---

[32] In the instant action, plaintiff did not bring any state law tort claims against the alleged harasser himself. Instead, she seeks to hold Legacy wholly responsible for the actions of an individual.

43

are committed in furtherance of the business of the employer; (2) the employee's acts are within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the conduct.  See Potts v. BE&K Constr. Co., 604 So.2d 398, 400 (Ala. 1992).  Since there is no allegation that the conduct of Cannoy was done in furtherance of Legacy's business or in the line and scope of employment, Legacy is liable for the conduct of Cannoy only if it participated in, authorized, or ratified Cannoy's conduct.  That is, Legacy is liable if: (1) Legacy had actual knowledge of the tortious conduct of Cannoy; (2) based on this knowledge, Legacy knew the conduct constituted a tort; and (3) Legacy failed to take adequate steps to remedy the situation.  See id.  "Adequate" steps are those which are reasonable and necessary to stop the tortious conduct.  Id. at 401.  The Alabama Supreme Court has held that where an employer takes inadequate corrective action by failing to investigate or reprimand the co-employee, that employer may be liable for the intentional torts of an employee.  See Mardis v. Robbins Tire & Rubber Co., 669 So.2d 885, 889 (Ala. 1995).  In contrast, where the specific tortious conduct stops after corrective action by the employer, the Alabama Supreme Court has held that the corrective action is adequate as a matter of law.  See Potts, 604 So.2d at 401.

### 1.      Invasion of Privacy (Count VII)

Under Alabama law, there are four wrongs that can constitute invasion of

privacy: (1) the intrusion upon the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false but not necessarily defamatory position in the public eye; and (4) the appropriation of some element of the plaintiff's personality for a public use." <u>Armstrong v. Standard Furniture</u>, 2006 WL 2503548, No. 04-00448, at *3 (11th Cir. 2006), <u>citing</u> <u>Phillips v. Smalley Maintenance Servs., Inc.</u>, 435 So.2d 705, 708 (Ala. 1983). Plaintiff's allegation is that her physical solitude or seclusion was intruded upon in violation of Alabama law. (<u>See</u> Doc. #25 at 28-29.)

Indeed, the Alabama Supreme Court has held that severe sexual harassment can be an invasion of privacy. <u>See</u> <u>Busby v. Truswal Sys. Corp.</u>, 551 So.2d 322, 324 (Ala. 1989). However, this court does not need to reach the question of whether the conduct of Cannoy rose to the level of invasion of privacy because there is no basis for holding Legacy liable for Cannoy's conduct. To survive summary judgment on her invasion of privacy claim against Legacy, Jemison must show that Legacy participated in, authorized, or ratified Cannoy's harassing conduct. <u>See</u> <u>Potts</u>, 604 So.2d at 400. There is no dispute in the record that Legacy, through Jemison, had knowledge of the alleged sexual harassment.[33] (AAF No. 10, AF No. 39; <u>see</u> <u>also</u>

---

[33] Plaintiff argues that Legacy was on notice of the potentially tortious conduct of Cannoy prior to Jemison's February 2004 complaint. However, the two other complaints would not have put Legacy on notice of potentially tortious conduct.

Jemison Dep. at 121.)   Further, there is no actual dispute in the record that after Jemison reported the harassment to Legacy, Jemison suffered no further incidents of sexual harassment.   Therefore, whatever corrective action Legacy undertook was adequate as a matter of law, and Legacy cannot be held responsible for Cannoy's alleged tortious conduct.

Accordingly, the court finds that defendant's motion for summary judgment as it relates to plaintiff's claim for invasion of privacy is due to be granted.

### 2.      Negligent and/or Wanton Hiring, Retention, Training, and Supervision (Count VIII)

Jemison asserts a cause of action against Legacy for negligent and/or wanton hiring, retention, training, and supervision of Cannoy, which is based upon her allegation that Legacy failed to protect Jemison from "illegal treatment."[34]   (See Compl. at ¶¶ 88-92.)   In order to establish a prima facie case for negligent hiring, training, supervision, or retention, Jemison must:

> [Affirmatively show] that had the master exercised due and proper diligence, the master would have learned of the incompetency.  This may be done by showing specific acts of incompetency and showing that they were brought to the knowledge of the master, or by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them.

---

[34] There is no evidence that Count VIII is premised on the facts that form the basis of Jemison's retaliation claim.

Mardis v. Robbins Tire & Rubber Co., 669 So.2d 885, 889 (Ala. 1995).[35]  As applied to the case at bar, Jemison cannot hold Legacy liable for any damages that resulted from actions of Cannoy prior to the time the company became aware of the alleged harassment.  There were no incidents of harassment after action was taken by Legacy in response to the allegations of plaintiff.[36]  Therefore, Legacy is not liable to Jemison for negligent and/or wanton hiring, retention, training, and supervision.

### 3.   Assault and Battery (Count X)

Under Alabama common law, a plaintiff alleging assault and battery must prove: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.  See Harper v. Winston County, 2004 WL 870456, No. 1021433 (Ala. April 24, 2004), citing Ex parte Atmore Comm. Hosp., 719 So.2d 1190 (Ala. 1998).  In

---

[35] In Mardis, the plaintiff alleged that her employer was liable for negligent supervision and training in that it failed to train its supervisory personnel in handling sexual harassment complaints and providing a means for employees to present their complaints.  The claims were based on the allegations that the plaintiff experienced sexual harassment at the hands of a co-employee.  The plaintiff quit her job the day after the alleged sexual harassment was reported to her employer.  The court held that the plaintiff had not shown that the employer had knowledge of the alleged incompetency of her co-employee until she reported the sexual harassment.  She could not have suffered any damages after the employer became aware of the incompetency due to the fact that she quit her employment the next day.  The employer was not liable for any actions which caused her damage prior to their knowledge of the incompetence.  See Mardis, 669 So.2d at 889-90.

[36] See footnote 33, supra.

<u>Atmore</u>, the plaintiff presented evidence indicating that the defendant "touched her waist, rubbed against her when passing her in the hall, poked her armpits near the breast area, and touched her leg." 719 So.2d at 1194.  The plaintiff also presented evidence indicating that "each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome." <u>Id.</u>  The <u>Atmore</u> court held that these factual assertions constituted substantial evidence that the defendant had committed a battery.  <u>See</u> <u>id.</u>

More often than not, the wrong in an assault and battery claim is not the actual touching, but the manner and spirit in which the touching is done.  <u>See id.</u>  "Thus, to lay hands on another in a hostile manner is a battery, though no damage follows; but to touch another merely to attract his attention is not a battery." <u>Id.</u>  Actual injury to the body is not a necessary element for an assault and battery claim.  <u>See</u> <u>Surrency v. Harbison</u>, 489 So.2d 1097, 1104 (Ala. 1986).  But where there is conflicting evidence on the occurrence of a battery, the question of whether a battery did occur is for the jury.  <u>See</u> <u>id.</u>

The court need not examine the evidence that a battery may have occurred in this case.  This is because to survive summary judgment on her assault and battery claim against Legacy, Jemison must show that Legacy participated in, authorized, or ratified Cannoy's harassing conduct.  <u>See</u> <u>Potts</u>, 604 So.2d at 400.  There is no

dispute in the record that Legacy, through Jemison, had knowledge of the alleged sexual harassment.[37]   (AAF No. 10, AF No. 39; see also Jemison Dep. at 121.) Further, there is no dispute in the record that after Jemison reported the harassment to Legacy, Jemison suffered no further incidents of sexual harassment.  Therefore, whatever corrective action Legacy undertook was adequate as a matter of law, and Legacy cannot be held responsible for Cannoy's alleged tortious conduct.

Accordingly, the court finds that defendant's motion for summary judgment as it relates to plaintiff's claim for assault and battery is due to be granted.

## V.    CONCLUSION

For the reasons stated above, Defendant Legacy Cabinets, Inc.'s Motion for Summary Judgment (doc. # 21) is due to be: **DENIED** as to Count I; **GRANTED** as to Count II; **GRANTED** as to Count III; **GRANTED** as to Count IV; **GRANTED** as to Count V; **GRANTED** as to Count VI; **GRANTED** as to Count VII; **GRANTED** as to Count VIII; **DENIED** as to Count IX; and **GRANTED** as to Count X.  Further, defendant's Motion (doc. #28) to Strike is due to be **GRANTED IN PART**, **DENIED IN PART,** and **MOOT** to the extent addressed within this memorandum opinion. A separate order will be entered.

---

[37] See footnote 33, supra.

**DONE** this 22nd day of February, 2007.

**VIRGINIA EMERSON HOPKINS**
United States District Judge